**Jon B. McKILLOP, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4072.**

Court of Appeals of Alaska.

Aug. 6, 1993.

David R. Weber, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Ethan A. Berkowitz, Asst. Dist. Atty., Edward E. McNally, Dist. Atty., Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

A jury found Jon B. McKillop guilty of harassment, AS 11.61.120(a)(4), for making anonymous telephone calls to the Anchorage Abused Women's Aid in Crisis (AWA-IC) shelter. McKillop appeals his conviction, asserting that his conviction rests on illegally seized evidence, that the trial judge misinstructed the jury on the meaning of "anonymous", and that the harassment statute is unconstitutional. We hold that the statute is constitutional if construed to require proof that the defendant's sole intent was to annoy or harass the recipient of the telephone call, but we reverse McKillop's conviction because the instructions his trial jury received did not

convey the limiting construction we adopt today.

Between 10:00 and 10:30 p.m. on January 8, 1991, the counselors working the AWAIC shelter crisis hotline received approximately six telephone calls from the same male caller. The caller told the female counselors that "there's no such thing as so-called abused women", that "I've been abused by a cunt all my life", that he'd lived with a "cunt" for four years, and that women "ought to go to Baghdad and kill some niggers".

The caller did not give his name. However, at one point he stated, "I'm Elvis Presley", and at another point he told a counselor, "By the way, I'm at 277–0088, Room 225 if you want free coke." The caller also told a counselor that "Elvis was king", not Martin Luther King, Jr., who was dead.

The counselors told the male caller to stop calling the shelter, and they hung up on him, but he kept calling. The counselors became concerned that the caller might be preventing others from using the crisis hotline; they also heard what sounded like slapping noises in the background, causing them to fear that someone was being abused. For these reasons, the counselors called the police.

Anchorage Police Officer Dan Seely and another officer went to the Budget Motel in Anchorage, after learning from police dispatch that this address corresponded to the telephone number recited by the caller. The two officers arrived at the motel at 11:12 p.m. and proceeded to Room 225. In response to the officers' knock, McKillop opened the door to the room. He was naked and apparently intoxicated.

Seely asked McKillop why he had been calling the AWAIC shelter. McKillop at first denied that he had made the calls, until Seely explained that the caller had disclosed his telephone number and room number. McKillop then admitted that he had made the calls. When Seely again asked why McKillop had made the calls, McKillop answered, "Because Elvis Presley is king, and Martin Luther King is dead."

Seely recognized this statement as the same one the anonymous caller had made to the AWAIC shelter counselor. At this point, Seely left to obtain a warrant for McKillop's arrest on a charge of harassment; the other officer stayed until the warrant could be obtained and served.

McKillop asked the district court to suppress his "Elvis is king" statement to Officer Seely. McKillop argued that this statement had been obtained as a result of a warrantless seizure, and he also argued that Seely had been obliged to provide McKillop with *Miranda* warnings before he questioned him. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At the evidentiary hearing on this issue, Seely testified that, when he and his fellow officer went to McKillop's hotel room, McKillop had stepped out into the hallway wearing no clothing. Other people in the motel hallway appeared to be offended by McKillop's nakedness, so Seely suggested that McKillop step back into his room. McKillop went along with this suggestion. Seely followed McKillop over the threshold, stepping into the doorway and thus partially into the room, to continue their conversation. Seely testified that McKillop did not specifically ask Seely to leave, but he did ask whether Seely had a search warrant or arrest warrant or any other authority to be there.

District Court Judge William H. Fuld declined to suppress the "Elvis" statement. Judge Fuld concluded that Seely and the officer had been merely investigating a crime and had not placed McKillop in custody during the "fairly brief contact" that began when Seely asked the naked McKillop to go back inside the room and continued while Seely was standing in the threshold of McKillop's room.

The test for whether a person is in "custody" for *Miranda* purposes is generally framed as whether a reasonable person would have felt free to break off questioning and ask the police to leave. *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979); *Edwards v. State*, 842 P.2d 1281, 1284

(Alaska App.1992). However, the fact that a defendant lacks immediate freedom to leave is not, by itself, determinative. A police-citizen encounter can constitute a "seizure" for Fourth Amendment purposes and yet not be "custody" for *Miranda* purposes. For example, the police are not required to give *Miranda* warnings during an investigative stop or detention of limited duration even when "considerable force" was used in making the stop. *Tagala v. State*, 812 P.2d 604, 608 (Alaska App. 1991).[1]

■ Here, the police knocked on McKillop's door and asked if he had been making calls to the women's shelter. They made no show of weapons, they did not engage in any search, and their questioning of McKillop was not extensive. Because McKillop was both drunk and naked, it was reasonable for the police to suggest that their conversation be held in some place other than a public hallway.

We recognize that McKillop repeatedly questioned the officers' authority to be there. However, Seely testified that McKillop never actually asked the police to leave, and no one testified that McKillop made a move to close the door or otherwise demonstrated that he wished an immediate end to the conversation. Under these facts, Judge Fuld was not clearly erroneous in finding that McKillop was not in *Miranda* custody when he made his "Elvis" statement to the officers.

■ McKillop's next argument concerns the jury instructions at his trial. McKillop was tried for harassment under AS 11.61.-120(a)(4), which reads:

A person commits the crime of harassment if, with intent to harass or annoy another person, that person

. . . . .

(4) makes an anonymous or obscene telephone call or a telephone call that threatens physical injury[.]

The State alleged that McKillop had violated this statute because his telephone calls to the AWAIC shelter had been "anonymous".

McKillop asked District Court Judge Martha Beckwith to instruct the jury that a telephone call was "anonymous" only if the caller failed to provide information from which his identity could reasonably be ascertained. McKillop pointed out that he had given the telephone number of his motel and his motel room number to the AWAIC counselors; he argued that his disclosure of this information meant that his calls had not been anonymous.

Judge Beckwith decided, after referring to a dictionary, that "anonymous" meant "nameless" or "lack[ing] ... identification"; she told the parties that she intended to instruct the jury accordingly. At this point, McKillop's attorney asked the judge to refrain from giving the jury any definition of "anonymous" and let the parties argue their own views of how that term should be defined for purposes of the harassment statute. Judge Beckwith acceded to this request.[2] On appeal, however, McKillop renews his primary argument: that his telephone calls to the AWAIC shelter were not anonymous because he disclosed the motel's telephone number and his room number.

■ The criminal code does not explicitly define the term "anonymous", nor does the commentary to AS 11.61.120 address the meaning of this term. We therefore use the word's common meaning, as disclosed in the dictionary, as our primary aid in determining the legislature's intent. *Michael v. State*, 767 P.2d 193, 197 (Alaska

---

1. Compare *Moss v. State*, 823 P.2d 671, 674–75 (Alaska App.1991), where this court, although declaring that the issue was "close", concluded that a defendant had been in custody (even though the police had told him that he was not formally under arrest) when the police entered the defendant's residence at gunpoint, questioned him extensively, spent two and one-half hours searching the residence, and "deprived [the defendant] of his freedom of action in a significant way".

2. McKillop's attorney argued to the jury (unsuccessfully) that McKillop's phone calls to the shelter had not been anonymous because, by divulging his telephone number and room number (although not the name of his motel), McKillop had invited discovery of his identity.

App.1988), *rev'd on other grounds,* 805 P.2d 371 (Alaska 1991).

■ *Webster's New World Dictionary of American English* (3rd College Ed. 1988), p. 56, gives two pertinent definitions of "anonymous": (1) "with no name known or acknowledged" and (2) "given, written, etc. by a person whose name is withheld or unknown". Under these definitions, McKillop's telephone calls to the women's shelter were anonymous. Courts in other states have applied these or similar dictionary definitions of "anonymous" when construing similar statutes prohibiting anonymous telephone calls. *See State v. Diede,* 319 N.W.2d 818, 821–22 (S.D.1982) (holding that a defendant who failed to identify himself was guilty of making "anonymous" telephone calls even though the recipients of the calls had had sufficient experience with the defendant to identify his voice); *see also Caldwell v. State,* 26 Md.App. 94, 337 A.2d 476, 486 (1975).[3]

McKillop's proposed definition of "anonymous" would have required the jury to determine, not only that McKillop had failed to disclose his identity, but also that his identity could not have been discovered through inquiry or investigation. McKillop's proposal thus varied significantly from the commonly understood definition of the word. McKillop's brief does not explain or provide authority for his claim that the Alaska legislature intended the word "anonymous" to be construed in the non-standard way he suggests. We conclude that Judge Beckwith did not abuse her discretion when she refused to give McKillop's proposed definitions to the jury.

---

**3.** We note that 47 U.S.C. § 223(a)(1)(B), the federal counterpart to AS 11.61.120(a)(4), prohibits a person from "mak[ing] a telephone call, whether or not conversation ensues, without disclosing his identity and with intent to annoy, abuse, threaten, or harass any person at the called number." This federal formulation appears to embody the same concept manifested in the dictionary definition of "anonymous".

**4.** This aspect of the statute (that it prohibits telephone calls that are intended to be annoying or harassing to the recipient) distinguishes McKillop's case from two of the authorities he

■ McKillop's final argument on appeal is that AS 11.61.120(a)(4) is unconstitutionally broad—that it attaches criminal penalties to protected speech.

McKillop argues that a person's wish to remain anonymous cannot, of itself, be punished. He points out that anonymous political speech (advocacy of social causes and attacks on government figures and policies) holds an honored place in our political tradition. *See Talley v. California,* 362 U.S. 60, 64–65; 80 S.Ct. 536, 538–39; 4 L.Ed.2d 559 (1960). For example, the Federalist Papers authored by Madison, Hamilton, and Jay were published under pseudonyms. *Talley,* 362 U.S. at 65; 80 S.Ct. at 539. McKillop also argues that a person cannot be punished for engaging in speech that annoys others. He notes that effective political speech will often cause annoyance, anger, or alarm in unsympathetic listeners. McKillop also points out that a speaker will often not know whether his or her listeners will find the speech annoying.

Here, however, the statute is not aimed at "pure speech" or the content of speech—the communication of ideas or opinions. Rather, the statute is directed at conduct: the caller's act of intruding upon someone else's privacy. AS 11.61.120(a)(4) prohibits a person from making anonymous telephone calls for the purpose of annoying or harassing another. The court in *People v. Smith,* 89 Misc.2d 789, 392 N.Y.S.2d 968, 970 (N.Y.App.1977), *cert. denied,* 434 U.S. 920, 98 S.Ct. 393, 54 L.Ed.2d 276 characterized the issue well when it declared that such a statute prohibits "a form of trespass". *Accord, State v. Gattis,* 105 N.M. 194, 730 P.2d 497, 502 (App.1986); *State v. Elder,* 382 So.2d 687, 690–691 (Fla.1980).[4]

---

cites, *Figari v. New York Telephone Co.,* 32 A.D.2d 434, 303 N.Y.S.2d 245 (N.Y.App.1969), and *Huntley v. Public Utilities Comm'n,* 69 Cal.2d 67, 69 Cal.Rptr. 605, 442 P.2d 685 (1968).

*Figari* and *Huntley* involved telephone company attempts to regulate an anti-communist group which produced pre-recorded messages that people could listen to by calling an advertised telephone number. The telephone companies tried to force the anti-communist group to identify itself on the taped messages, but the New York and California courts struck down the telephone regulations as violative of the group's freedom of speech. McKillop argues

The conduct prohibited by AS 11.61.-120(a)(4) may often involve speech, but it need not. A person could violate the statute by calling another person, listening in silence when that person answered the phone, and then hanging up. *Compare Gormley v. Director, Connecticut Dept. of Probation,* 632 F.2d 938, 942 (2nd Cir. 1980), *cert. denied,* 449 U.S. 1023, 101 S.Ct. 591, 66 L.Ed.2d 485; *State v. Gattis,* 730 P.2d at 502.

■ The fact that AS 11.61.120(a)(4) prohibits conduct that may involve speech does not invalidate the statute on freedom of speech grounds. A caller may use words as the method of harassing the recipient of the call; this means only that AS 11.61.-120(a)(4) deals with an aspect of conduct mixed with speech.

> [Making a course of conduct illegal] has never been deemed an abridgement of freedom of speech or press ... merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.

*Cox v. Louisiana,* 379 U.S. 559, 563; 85 S.Ct. 476, 480; 13 L.Ed.2d 487 (1965). *See State v. Elder,* 382 So.2d at 690–691. When a statute is aimed at conduct that involves speech, the governing First Amendment test is stated in *Broadrick v. Oklahoma,* 413 U.S. 601, 615; 93 S.Ct. 2908, 2918; 37 L.Ed.2d 830 (1973):

> [When] conduct and not merely speech is involved, ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

Thus, we must decide whether McKillop has shown that any possible infringement of the right of free speech wrought by AS 11.61.120(a)(4) is "real" and "substantial" when compared to the scope of the statute's legitimate regulation of conduct.

The statute does not punish speech simply because it is anonymous. While "the anonymity of the caller is ... itself a circumstance raising discomfort and fear in the receiver of the call", *State v. Elder,* 382 So.2d at 691, quoting *United States v. Darsey,* 342 F.Supp. 311, 313 (E.D.Pa. 1972), nevertheless the statute requires proof of an additional element: that the caller's purpose was to annoy or harass the other person. Nor does AS 11.61.120(a)(4) suffer from the defect of punishing speech simply because it may have the effect of annoying the listener. As the court noted in *Constantino v. State,* 243 Ga. 595, 255 S.E.2d 710, 713 (1979), *cert. denied,* 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306,

> [T]he victim's subjective ideas on what is or is not harassing are not in issue. The point is that the defendant telephones *intending* to harass, and he certainly knows if he is doing that.

This court used the same reasoning in *Jones v. Anchorage,* 754 P.2d 275 (Alaska App.1988), to uphold a municipal ordinance making it illegal "for any person to anonymously or repeatedly telephone another person for the purpose of annoying, molesting, ... abusing ..., or harassing that person or his family." 754 P.2d at 278.[5] This court declared:

> The ordinance challenged in this case ... is readily distinguishable from provisions found to be invalid on grounds of vagueness. Cases have condemned statutes as unduly vague when those statutes prohibited conduct or speech resulting in annoyance to others, without ... specifying "upon whose sensitivity a violation does depend—the sensitivity of the judge or jury, the sensitivity of the ar-

---

that *Figari* and *Huntley* stand for the proposition that the government can never force people to identify themselves. However, there is an obvious distinction between, on the one hand, a person or group that offers people the opportunity to call and hear a recorded message (if they wish) and, on the other hand, a person who makes unsolicited calls to other people for the purpose of annoying or harassing them.

**5.** The defendant in *Jones* made at least 38 abusive telephone calls to her ex-boyfriend and his new girlfriend; in many of these calls, she identified herself. 754 P.2d at 276–77. Thus, the anonymity provision of the ordinance was not at issue; rather, the question presented in *Jones* was the constitutionality of the section of the ordinance prohibiting a person from "repeatedly telephon[ing] another".

resting officer, or the sensitivity of a hypothetical reasonable [person]."

In contrast, the ordinance challenged here does not purport to hinge the unlawfulness of speech or conduct on the standardless, subjective reactions of unspecified third persons. To the contrary ... [and] significantly, ... the lawfulness or unlawfulness of the act turns ... on the specific intent of the accused.

*Jones,* 754 P.2d at 278, quoting *Coates v. City of Cincinnati,* 402 U.S. 611, 613; 91 S.Ct. 1686, 1688; 29 L.Ed.2d 214 (1971).[6]

McKillop nevertheless argues that political speakers often intend to "annoy" their listeners; political speech is frequently intended to make people uncomfortable and force them to re-examine their actions or convictions. McKillop therefore concludes that the specific intent element does not save AS 11.61.120(a)(4) from overbreadth.

We agree that a person engaging in advocacy or criticism may legitimately intend to annoy or disturb his or her listeners. Nevertheless, "the right of every person to be le[f]t alone must be [weighed] in the scales [against] the right of others to communicate." *Rowan v. United States Post Office Dept.,* 397 U.S. 728, 736; 90 S.Ct. 1484, 1490; 25 L.Ed.2d 736 (1970) (upholding a federal statute that requires the Post Office, upon request of an addressee, to order businesses to remove the addressee's name from their mailing lists for "pandering advertisements").[7]

Under the general definition of "intentionally" contained in AS 11.81.900(a)(1), a defendant's intent to cause a prohibited result (here, annoyance or harassment) "need not be the person's only objective". Thus, when AS 11.61.120(a)(4) is read in conjunction with AS 11.81.900(a)(1), the statute is theoretically broad enough to punish political speech or other legitimate communication upon proof that one of the speaker's subsidiary motives was to annoy the listener. Because the scope of the statute is potentially so broad, we conclude that AS 11.61.120(a)(4) must be interpreted to prohibit telephone calls only when the call has no legitimate communicative purpose—when the caller's speech is devoid of any substantive information and the caller's sole intention is to annoy or harass the recipient.

This court gave a similar limiting construction to the municipal ordinance in *Jones v. Anchorage,* 754 P.2d at 279. This limiting construction is consistent with AS 11.81.900(a)(1), because the legislature has declared that the general definition of "in-

---

**6.** Courts are in virtually unanimous agreement that the requirement of specific intent (that is, requiring the government to prove that the caller's subjective purpose in making the call was to annoy or harass) saves statutes such as AS 11.61.120(a)(4) from vagueness problems. See *State v. Elder,* 382 So.2d at 691–92, in which the court upheld the constitutionality of a statute forbidding a person from "mak[ing] a telephone call ... without disclosing his identity and with intent to annoy, abuse, threaten, or harass any person at the called number".

Indeed, most decisions in this area deal with statutes that simply forbid telephone calls made for the purpose of annoyance or harassment, without the additional element that the caller fail to identify himself. Such statutes are virtually always upheld against vagueness attacks because they include the element of specific intent. *Jones v. Anchorage* cites several of these decisions. 754 P.2d at 278–79. Other cases reaching the same conclusion are: *United States v. Lampley,* 573 F.2d 783, 787 (3rd Cir.1978); *Donley v. City of Mountain Brook,* 429 So.2d 603, 606–613 (Ala.Cr.App.1982), *rev'd on other grounds,* 429 So.2d 618 (Ala.1983); *State v. Ha-*

*gen,* 27 Ariz.App. 722, 558 P.2d 750, 753 (1976); *People v. Weeks,* 197 Colo. 175, 591 P.2d 91, 94 & n. 1 (1979); *Kinney v. State,* 404 N.E.2d 49, 50–51 (Ind.App.1980); *Caldwell v. State,* 26 Md. App. 94, 337 A.2d 476, 481–82 (1975); *State v. Gattis,* 105 N.M. 194, 730 P.2d 497, 502–03 (App. 1986); and *People v. Smith,* 89 Misc.2d 789, 392 N.Y.S.2d 968, 970–71 (N.Y.App.1977), *cert. denied,* 434 U.S. 920, 98 S.Ct. 393, 54 L.Ed.2d 276 (1977).

**7.** We also note that what begins as protected speech may ultimately violate the harassment statute. See, for example, *People v. Smith,* 392 N.Y.S.2d 968, in which a citizen repeatedly called the police department to make a complaint. The police informed him several times that the matter was civil and that he was tying up police phone lines; he nevertheless continued to call the police 27 times in the following 3½ hours. The court held that "the impropriety was not in the complaint made by the defendant but in its repetition." *Id.* at 971. That is, the caller's actions provided a basis for a fact-finder to conclude that the caller had previously accomplished any legitimate communication and his sole intent had become to annoy or harass.

tentionally" is to be applied "unless the context requires otherwise". Here, the First Amendment requires a different, narrower definition.[8]

Applying this limiting construction to AS 11.61.120(a)(4), we hold that the statute is neither vague nor overbroad. So limited, the statute is a constitutional exercise of legislative authority to regulate conduct involving speech. Having reached this legal conclusion (that is, having given a new, limiting construction to the harassment statute), we must now examine the record of McKillop's trial to see if he might have been convicted of harassment for engaging in protected speech.

 McKillop's main defense at trial was that his telephone calls to the AWAIC shelter had not truly been anonymous. However, McKillop's attorney also asked the jury to consider whether McKillop's real intention had been to harass or annoy, or whether, instead, McKillop had been drunkenly attempting to communicate personal grievances, albeit through intemperate, reprehensible language:

> DEFENSE ATTORNEY: [E]vidence that the defendant was intoxicated may be ... relevant to negate an element of the offense that requires that [he] intentionally caused a result. In this case, the State has to show that he intentionally called to harass or annoy another person. And, for that, you can take into consideration whether or not he was intoxicated.... You should take that into consideration in deciding whether or not the State's proved beyond a reasonable doubt that, at the time he made these calls, [he] intended really to harass or annoy, or if he was just calling these people, venting ... the feelings that he

had, apparently, at that moment, in his [state] of intoxication, that he so heartfelt [sic] wanted to share. Even though they were obnoxious, clearly.

Thus, McKillop asked the jury to consider whether the State had proved the intent element of the crime.

As we have discussed above, this element of the statute must be construed to require proof that McKillop's sole intent was to harass or annoy. If McKillop truly intended to engage in communicative speech when he made the calls to the AWAIC shelter, then even if he also intended to harass or annoy, he should not have been convicted. However, the district court's jury instruction on this point tracked the language of AS 11.81.900(a)(1): "A person may act intentionally with respect to causing a particular result even though causing that result was not the person's only objective." This instruction was erroneous; it told the jury to convict McKillop even if they believed that, in addition to trying to annoy or harass the women at the AWAIC shelter, McKillop had also tried to engage in legitimate communication with them.

 From our description of the evidence at McKillop's trial, it might well seem that his telephone calls to the AWAIC shelter lie at the core of the statutory prohibition—anonymous telephone calls intended only to abridge the privacy interests the statute was designed to uphold, without any claim to legitimate communication of ideas or information. However, this was an issue of fact for the jury to decide. The court's instructions on the elements of the offense in effect told the jurors to ignore this crucial issue.

---

8. This same limitation is sometimes explicitly written into other states' statutes. *See Donley v. City of Mountain Brook,* 429 So.2d at 605 ("with intent to harass or alarm [and] with no purpose of legitimate communication"), and *Kinney v. State,* 404 N.E.2d 49, 50 (Ind.App.1980) ("with intent to harass, annoy, or alarm another person, but with no intent of legitimate communication"). More often, a telephone harassment statute is silent on this point, and the limitation is inferred by courts. *State v. Gattis,* 730 P.2d at 503; *State v. Elder,* 382 So.2d at 691; *United*

*States v. Lampley,* 573 F.2d at 787 (Congress has a "compelling interest in the protection of innocent individuals from fear, abuse, or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives."). *But compare Gormley v. Director, Connecticut Dept. of Probation,* 632 F.2d at 942–43 & n. 5 (suggesting that a harassment statute that requires proof of specific intent has so little potential for abridging protected speech that it requires no additional limiting gloss).

Because the error in the jury instructions lies in the court's definition of the elements of the offense, we must reverse McKillop's conviction and return his case to the district court for a new trial unless we are convinced that the error was harmless beyond a reasonable doubt. *St. John v. State,* 715 P.2d 1205, 1209–1211 (Alaska App.1986). Despite the strength of the State's case, we believe there is a reasonable possibility that the jury's verdict would have been different if the jurors had been correctly instructed on the elements of the offense. For this reason, we RE-VERSE McKillop's harassment conviction and remand his case to the district court for a new trial.